IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

SEPTEMBER 1995 SESSION



**FILED**

**December 1, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9502-CC-00045 |
| | ) | |
| | ) | Carroll County |
| v. | ) | |
| | ) | Honorable C. Creed McGinley, Judge |
| | ) | |
| CHRISTOPHER DAVID WILSON, | ) | (First Degree Murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:                    For the Appellee:

Raymond L. Ivey                       Charles W. Burson
P.O. Box 229                          Attorney General of Tennessee
Huntingdon, TN 38344                          and
                                      Charlotte Rappuhn
                                      Assistant Attorney General of Tennessee
                                      450 James Robertson Parkway
                                      Nashville, TN 37243-0493

                                      G. Robert Radford
                                      District Attorney General
                                      111 W. Paris St., P.O. Box 686
                                      Huntingdon, TN 38344-0686
                                              and
                                      John Overton
                                      Assistant District Attorney General
                                      Savannah Courthouse
                                      Savannah, TN 38372

OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Christopher David Wilson, appeals as of right from his jury conviction in the Circuit Court of Carroll County for first degree murder. He received a life sentence for the conviction. He contends that:

> (1) there is insufficient evidence to support his conviction;
>
> (2) the trial court erred by failing to suppress the defendant's statement;
>
> (3) the jury selection process constituted prejudice to the judicial process; and
>
> (4) the trial court erred by admitting testimony concerning the defendant's prior bad acts.

We affirm the judgment of the trial court.

This case involves the February 25, 1994, shooting death of Ronnie Adams at Walker's Grocery Store on Highway 70 in Leech, Tennessee. At trial, Cathy Giles testified that she was working at the store that day. She said that she and the victim were sitting at a table in the store when the defendant and another man entered the store. She said that the defendant had a .357 pistol in his hand and asked her about a special order for some pistol grips for his gun. She told the defendant that she did not know anything about a special order for any pistol grips but that she would show him the pistol grips that she had.

As Ms. Giles stepped behind the counter, she noticed a third man outside the store pumping gas. Ms. Giles recalled that she asked the defendant for his gun, and the defendant responded by unloading the gun and placing the bullets on the counter. Ms. Giles said that she gave the defendant a screwdriver to take the grips off his gun and then showed him the grips that she had. She said that it was obvious that all of the pistol grips she had were too small for the gun but that the defendant indicated that he had another gun and wanted to see if the grips would fit that gun.

2

At this point, the man that had been pumping gas outside the store, entered the store. Ms. Giles said that the victim told her that he thought the man wanted to pay for the gas he pumped. Ms. Giles recalled that as she walked toward the cash register, the man that had entered the store with the defendant dropped two silver rings on the floor, the defendant began picking up his bullets, gun and grips, and the man who had pumped the gas left the store and entered the driver's side of the car. Ms. Giles then heard a noise and saw that the man that had dropped the rings had moved halfway around a knife case and was going back and forth between two counters. She saw the man fall over along with the knife case and a video rack and then heard a gunshot. Seconds later, the defendant ran toward her, ordering her to get down. She said that the defendant then ran back towards the victim and the other man and that she grabbed a pistol from under the counter and ran out of the store.

Once outside, Ms. Giles fired a shot at the car that had the third man in it, and the man drove off toward Jackson. She ran into a neighbor's garage to call the police. Ms. Giles said that as she left the garage, she saw the defendant and the other man and she fired a few shots at them as they ran behind the store into the woods. Ms. Giles went back into the store and discovered that the victim was injured. She called for an ambulance. While she was on the telephone, the car with the third man in it traveled slowly by the store with its horn blowing. The car traveled slowly by the store again a short time later. Ms. Giles also said that the store had a concrete floor in it.

Brian Byrd, a special agent with the Tennessee Bureau of Investigation (T.B.I.), testified that he processed and videotaped the crime scene. When he arrived at the scene, the victim was lying on the floor behind a counter and a rack of merchandise that had been knocked over. There was a gun and pistol grips on one of

3

the counter tops and screwdrivers on a table in front of the victim. Two rings were also found near the victim. Agent Byrd identified several items that were found at the scene.

Agent Byrd also testified that he was involved with processing an Audi. He identified several items that were taken from the car, including a thermal mask, a set of stockings that had the legs clipped out of them, and bullets that matched those he found at the crime scene. A videotape of the crime scene and the Audi was played for the jury.

David Bunn, an investigator with the Carroll County Sheriff's Department, testified about his investigation of the shooting. He said that he helped apprehend the defendant and Archie Montague the day after the shooting. He said that the defendant directed him to the places where two guns were found, a .357 pistol that was directly behind the store eight hundred feet into the woods and a .380 caliber handgun that was approximately four miles behind the store between two logs in a hollow. Investigator Bunn also identified pictures of the guns, the crime scene and the surrounding area.

Another investigator with the Carroll County Sheriff's Department, Buck Gately, said that he helped apprehend the defendant while the defendant and another man were walking along a road. He testified that the defendant was unkempt at the time of his arrest and was bundled up with clothes. He also stated that the defendant had a knife in his pocket at the time of his arrest.

Richard Sawyers, a Huntingdon police officer, testified about his observations at the store and about his role in apprehending the defendant. He said that the defendant was dirty and was wearing two pairs of pants and three or four shirts at the time of his arrest. Officer Sawyers said that the defendant may have been

4

wearing a coat as well. He explained that the clothes that the defendant was wearing did not fit the defendant.

State Trooper Ollie Parker testified that he stopped an Audi on the day of the shooting. He searched the car, finding a billfold, some assorted business cards, a box of .38 Special ammunition and one clip of .380 ammunition in the glove box. He said that he did not find a thermal mask in the car.

Leigh Browder, a T.B.I. criminal investigator, testified about her investigation into the shooting. She explained that the defendant's driver's license had been found in a car that a trooper stopped in relation to the case. Agent Browder said that the defendant signed a waiver of rights after his arrest and gave a statement about the shooting. The statement was read to the jury. In it, the defendant detailed his actions on the day of the shooting. The defendant said that on the morning of the shooting, he went to a car dealership and picked up an Audi that he had planned to take to the bank to try to get a loan. He said that he drove the car back to his house to get some tapes and a .357 pistol. He stated that he picked up the pistol because a friend of his, Joseph Godwin, had told him that he knew of someone who might want to buy the gun.

According to the statement, the defendant then drove to Godwin's house where he met a man named Kaswasi. The defendant said that he and Kaswasi then rode to Archie's house, and the three went riding around. The defendant said that Kaswasi and Archie offered to pay him two hundred fifty dollars to stop at Walker's Grocery Store. He said that when he pulled into the store Kaswasi and Archie changed plans. He said that Kaswasi told him to go into the store and to try to sell his gun.

5

The defendant stated that he entered the store and asked the lady in the store whether she had any grips to fit his gun. The defendant said that Archie entered the store and picked up a couple of candy bars and that Kaswasi entered the store to pay for the gas. The defendant stated that Archie stuck a gun to the victim's neck and began to wrestle with the victim. He said that the cashier started yelling and pulled a pistol out from under the register. The defendant recalled hearing a shot and seeing Kaswasi and the cashier running out of the store. He said that he heard two more shots and then Archie pushed him out of the store.

In the statement, the defendant said that Kaswasi was yelling for a gun as he drove off. The defendant said that he threw his pistol into the window of the car and that he and Archie ran off into the woods. He recalled that somebody fired at them as they ran off. He said that he and Archie walked through the woods until they came to a church. They spent the night in a pump house near the church.

Agent Browder testified that she interviewed Archie Montague and that Montague admitted having a .380 automatic pistol while he was in the store. Agent Browder also identified a picture that was developed from film taken from the defendant's apartment. She said that the picture showed the same .380 automatic pistol that was found in the woods.

Ursal Maness, a secretary at West Main Motors, testified that the owner of the car dealership, Gordon Sipes, brought the defendant into her office and told her to write out a Buyer's Order on a 1984 Audi in order for the defendant to try to borrow money for the car. She recalled that the defendant left her office and had another conversation with the owner of the dealership. A short time later the defendant returned to her office and asked her where a tag was for the car. She said that she

6

asked the defendant whether he had permission to drive the car and that the defendant told her that he did. Accordingly, she gave the defendant a tag and keys for the car.

Gordon Sipes testified that he did not give the defendant permission to drive the Audi. He said that the defendant took the car from the lot at about 9:30 a.m. and that he drove to the defendant's address looking for the car at around 3:00 p.m. He said that when he returned to the lot thirty minutes later, he received a call from the highway patrol.

William Ballard testified that he had known the defendant for over a year. He recalled that the defendant contacted him on February 18 and told him that he wanted to talk to him. Ballard said that he and a couple of his friends met with the defendant the next day and the defendant talked about robbing a store. According to Ballard, the defendant asked him and his friends whether they wanted to go with the defendant to rob a store. He said that the defendant drew a map of how to get to a country store in Henderson. He said that the defendant told them that three of them would go into the store and that one would stay at the car and act like he was pumping gas. He said that the defendant told them that the defendant had a shotgun that could be used in the robbery. Ballard said that he and his friends told the defendant that they would go to Covington to get their own guns and that they would return later that day. Ballard said that he and his friends never returned. Ballard admitted that he first thought the defendant was joking about the robbery but said that the defendant became very serious about the robbery.

Gary Johnson testified that he accompanied Ballard when he met with the defendant. He said that the defendant talked about robbing a store and showed them a map. He said that the defendant told them that they would be in the store for two minutes and then run out of the store. Johnson said that the defendant told them that

7

they would steal guns from the store. According to Johnson, the defendant told them to shoot the guy behind the counter if the guy pulled out a gun. Johnson said that the defendant had a .380 automatic pistol and a shotgun that could be used in the robbery. Johnson said that he did not believe that the defendant was joking about the robbery. He also identified the .380 automatic pistol that was found in the woods as being the same gun that he saw in the defendant's living room.

Charles Wilson testified that he accompanied William Ballard and Dale Johnson to the defendant's house. He said that the defendant talked to them about robbing a store. He corroborated Ballard's and Johnson's testimony concerning the map and remembered seeing the defendant with a shotgun. He said that he, Ballard, and Johnson told the defendant that they were going to get guns but that they never returned. He said that at first he thought that the defendant was joking about the robbery but that he later believed that the defendant was serious.

John Mehr, a special agent with the T.B.I, testified that he went to the defendant's apartment looking for evidence. He said that a lady that was living with the defendant told him he could search the apartment. He identified a letter he found in the apartment that said, "Baby, I have gone to take the game back. William gave me a beep and wants to meet and take a look at my .380. He wishes to buy it. Love you, Chris." Agent Mehr also identified a pair of plastic goggles, an empty box for .380 automatic full metal jacket shells, an empty .22 Thunderbolt long rifle shell box, an empty box for a .357 Magnum, a .22 long rifle, and an empty .22 single bolt shell box that were taken from the apartment. Agent Mehr said that he also confiscated a roll of undeveloped film from the apartment.

Steve Scott testified that he works in the firearms identification section of the T.B.I. lab. He testified that the .357 Magnum had five bullets in it when he received

8

it and that the bullets were similar to those found in a box of ammunition that had been sent to the lab. Agent Scott said that the .380 semi-automatic pistol was loaded and had a bullet in its chamber when he received it. He said that he noticed a crack in the shroud that encloses the chamber of the gun and that such a crack could make the gun very dangerous to fire. Agent Scott identified a fired bullet that had been submitted with the other ammunition. He explained that the bullet had a full metal case and was deformed because it was completely flattened on one side, indicating that it had struck something quite hard, such as a concrete floor. He said that the bullet had been fired from the .380 pistol. He explained that the pistol had a trigger pull greater than thirteen pounds, which is quite heavy. Agent Scott also identified a revolver, three cartridges and three cartridge cases that he removed from the revolver. He explained that the three cartridge cases were fired in the revolver.

The Deputy Chief Medical Examiner for West Tennessee, Dr. Obrian Cleary Smith, testified that the victim died from a gunshot wound to the back of his neck. He explained that the victim had powder burns, which indicated that the gun was fired from within twelve inches from the victim. Dr. Smith said that the victim could not have moved after he was shot because the bullet severed his spinal cord.

The defendant was the only witness who testified for the defense. He said that he picked up a 1984 Audi on February 25 and was supposed to take it to the Bank of Ripley to try to get a loan. He said that he drove the car to his apartment to pick up some tapes and his .357 and .380 guns. He explained that Joseph Godwin had told him that somebody may want to buy the .357 and that he knew that another person wanted to buy the .380. The defendant said that he went over to Godwin's house, where he showed Godwin and Kaswasi Williams his guns. He said that they then went to Archie Montague's apartment and showed him a gun. The defendant said that Montague asked to test fire the gun. The defendant said that he took Godwin home

9

and went riding around with Archie Montague and Kaswasi Williams. He said that they planned to go out to shoot the .380 but then decided to go visit a friend of the defendant's in Huntingdon.

The defendant said that he stopped at Walker's Grocery Store because the car needed gas. The defendant said that he was on his way into the store when he remembered that the store had some pistol grips the last time he was there. The defendant said that he returned to the car and took the .357 into the store and asked Ms. Giles about getting some pistol grips. He said that Ms. Giles looked for a screwdriver that he could use to remove the grips from his pistol. The defendant said that he was trying to get the grips off his gun when Archie Montague entered the store and picked up some candy or gum and walked over to the counter. He said that Ms. Giles walked to the cash register and said something to Kaswasi Williams as he came to the door. The defendant said that he looked at Ms. Giles when she spoke and then heard a noise. He said that he then saw the victim pulling on Archie Montague's hood. He said that Archie Montague started falling over.

As the victim and Montague were struggling, the defendant noticed that Ms. Giles had a gun. He said that he yelled to Montague and Kaswasi to warn them that she had a gun and that Kaswasi ran out of the store. The defendant said that Ms. Giles followed Kaswasi out of the store and that he then heard a shot. He said that he grabbed Montague and told him to leave because Ms. Giles was trying to shoot them. The defendant said that he and Montague ran from the store and that Ms. Giles shot at them.

The defendant said that he threw his gun down behind the store and walked until he got to a church. He said that it was cold that night and that he took blankets from the church. The defendant said that he was hungry, tired, and cold at the

10

time of his arrest. The defendant went through the statement that he gave police and identified parts of it that were not true. The defendant explained that one of the agents who interviewed him tried to blame him for the shooting. The defendant said that when he gave his statement he tried to blame Kaswasi and Montague. He said that he showed the agents where the guns were to prove to them that he did not try to rob or kill anybody. The defendant said that the only plan that he and Kaswasi and Montague had when they stopped at the store was to get gas. The defendant denied planning or discussing a robbery of the store.

On cross-examination, the defendant admitted joking with Mr. Ballard, Mr. Johnson, and Mr. Wilson about robbing a store out in the country. The defendant said that he was intoxicated when he joked about robbing a store and could not remember everything that he said.

I

The defendant argues that there is insufficient evidence to sustain his first degree murder conviction because the state failed to prove that the killing was committed during an attempted robbery. Although the defendant testified that he had no plans to rob the store, the jury obviously disbelieved the defendant and instead accredited the proof the state presented.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield,

11

676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

When viewed in the light most favorable to the state, the proof at trial established that the defendant, Montague, and Williams drove to the store to rob it and that the victim was killed during the attempted robbery. Approximately a week before the shooting, the defendant approached three men and detailed a plan for robbing a store. Like Walker's Grocery Store, the store the defendant talked about robbing sold guns and gas. The defendant planned for at least one man to stay at the car and act like he was pumping gas while the others would enter the store and steal guns. The defendant planned that they would shoot the guy at the store, if he pulled out a gun. On February 25, the defendant picked up his two guns and drove Montague and Williams to Walker's Grocery Store. Once at the store, Williams pumped gas into the car while the defendant and Montague entered the store. After the car was full of gas, Williams entered the store and then exited it without paying for the gas. Montague dropped a couple of rings on the floor and then scuffled with the victim, shooting him in the neck with one of the defendant's guns. Based on these facts, the jury was justified in concluding that the defendant was guilty of felony murder beyond a reasonable doubt.

II

The defendant contends that the trial court erred by failing to suppress his statement due to misconduct of the investigating officers. The defendant asserts that he was tired, hungry, and cold when he was arrested and that one of the agents who interrogated him repeatedly accused him of shooting the victim. He argues that his statement was coerced and obtained by false promises of leniency.

12

At the suppression hearing, the defendant testified that he had been in the woods for twenty-four hours at the time of his arrest. He said that the weather was cold and he had walked through some water. He said his feet were numb and that he was wearing a sweater without a T-shirt under it. The defendant said that he did not sleep any during the forty-eight hours before his arrest and that he did not eat anything for more that twenty-four hours before his arrest. The defendant said that he was tired, hungry, and scared at the time of his arrest. He said that he was so tired and there was so much going on that he could not think straight.

The defendant said that he was taken to jail, where he was questioned by three officers. He said that one of the officers, Agent Lewis, kept accusing him of shooting the victim and told him that Ms. Giles, Kaswasi Williams, and Archie Montague all identified him as the person who had done the shooting. The defendant said that Agent Lewis told him that he was facing a life sentence for first degree murder but promised to help him out if he cooperated. The defendant said that he waited thirty or forty-five minutes before he gave a statement. The defendant said that he gave the statement after he watched through a window as the officers talked to Archie Montague. The defendant said that he requested food while he was being questioned and received a cheeseburger or hamburger. The defendant said that he was not furnished with dry clothes before he gave the statement. The defendant said that he did not believe the statement he gave was voluntary because he should have been given more time to think about it.

On cross-examination, the defendant admitted that he signed a waiver of rights and that his rights were explained to him. However, the defendant claimed that he signed the waiver of rights after he had given his statement. The defendant conceded that the statement accurately reflects what he told the officers and that nobody "twisted his arm" to make him sign it.

13

Agent Browder testified that she helped interview the defendant. She said that the defendant waived his rights before he gave the statement. She said that she explained the defendant's rights to him and that he appeared to understand them. She said that the defendant never said that he was too sleepy, hungry, or tired to give a statement. She said that the defendant was offered food but did not want it. Agent Browder denied making any threats or promises to the defendant. She said that in her opinion the statement was given freely and voluntarily. On cross-examination, Ms. Browder admitted that she may have told the defendant that if he cooperated, she would tell the district attorney general about his cooperation.

Agent Tommy Lewis testified that he also helped question the defendant. He said that the defendant declined his offer of food before the interview. He testified that the defendant waived his rights before he gave the statement and that the defendant seemed to understand the questions that were asked of him. Agent Lewis said that no threats or promises were made to the defendant and that the defendant freely and voluntarily gave the statement. On cross-examination, Agent Lewis admitted that the defendant looked rough when he was brought to the jail but said that he did not recall the defendant being wet. Agent Lewis also said that he did not recall whether he told the defendant that he knew the defendant shot the victim.

The trial court overruled the motion to suppress, finding that the defendant voluntarily waived his rights and that there was nothing to indicate that sleep deprivation, hunger, or anything else overcame the defendant's free will. A trial court's findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The record in this case supports the trial court's findings. Thus, the issue is without merit.

14

### III

The defendant contends that the jury selection process used at his trial violated Rule 24(c), Tenn. R. Crim. P., and caused prejudice to the judicial process. The state counters that the defendant has waived the issue by failing to object at trial and that the jury selection process used at the defendant's trial did not violate Rule 24(c).

The jury selection process at the defendant's trial began with the trial court's selection of eighteen prospective jurors. The first twelve prospective jurors were seated in the jury box and the last six were seated in front of the jury box. All eighteen prospective jurors were questioned by both sides, but peremptory challenges were only exercised with respect to the first twelve. Challenged jurors were then replaced by the prospective jurors that had been seated in front of the jury box. After six prospective jurors were challenged, the trial court selected six more prospective jurors, and additional voir dire was conducted.

Initially, we note that the defendant did not object to this jury selection process at trial. A party who fails to take whatever steps that are reasonably available to avoid or to cure an error is not entitled to relief. T.R.A.P. 36(a), Advisory Commission Comments. In this vein, the defendant has waived his challenge to the jury selection process. However, the circumstances would not give rise to relief anyway.

At the time of the defendant's trial, Rule 24(c), in relevant part, stated:

> **(c) Peremptory Challenge and Procedure for Exercising.**
> After twelve prospective jurors have been passed for cause, counsel will submit simultaneously and in writing, to the trial judge, the name of any juror either counsel elects to challenge peremptorily. . . . Replacement jurors will then be examined for cause and, after passed, counsel will again submit simultaneously, an in writing, to the trial judge the name of any juror counsel elects to challenge peremptorily. This procedure

15

> will be followed until a full jury has been selected and accepted by counsel. Peremptory challenges may be directed to any member of the jury and counsel shall not be limited to replacement jurors. Alternate jurors will be selected in the same manner
> . . . .

In this case, the trial court deviated from the prescribed procedure by allowing the parties to question eighteen prospective jurors at once.

The defendant relies upon State v. Coleman, 865 S.W.2d 455 (Tenn. 1993), to argue that the jury selection procedure used at his trial constituted prejudice to the judicial process. In Coleman, the supreme court disapproved with the use of a similar jury selection procedure because compliance with Rule 24(c) is mandatory. The court explained that the "rules prescribing jury selection procedures are intended to protect the integrity of the jury system by providing a uniform and ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community." Coleman, 865 S.W.2d at 458 (citations omitted). Although the court in Coleman refused to grant the defendant relief because he had failed to demonstrate that he was prejudiced by the jury selection process, it warned that "any future deviation could constitute prejudice to the entire judicial process and require reversal." Id. (citations omitted).

Like the defendant in Coleman, the defendant in this case has failed to demonstrate that the jury selection process prejudiced him or resulted in purposeful discrimination. See id. Although we agree with the defendant that a trial court's deviation from Rule 24(c) may result in prejudice to the judicial process, we do not believe that the trial court's deviation in this case prejudiced the judicial process. Effective July 1, 1997, Tenn. R. Crim. P. 24(c) was amended to allow for the jury selection process that was used at the defendant's trial. Under these circumstances and the defendant's failure to object to the jury selection procedure, we hold that the trial court's deviation from Rule 24(c) is not cause for a reversal. See id.; State v. Terry

16

<u>Lynn Anthony</u>, No. 02C01-9605-CC-00159, Tipton County slip op. at 10 (Tenn. Crim. App. Mar. 18, 1997); <u>State v. Phyliss Ann McBride</u>, No. 01C01-9606-CC-00269, Rutherford County slip op. at 6 (Tenn. Crim. App. Oct. 24, 1997).

**IV**

The defendant contests the admission of testimony concerning his prior plan to rob a gun store. The defendant argues that the trial court erred by failing to hold a jury-out hearing to assess the probative value of the evidence and its risk of unfair prejudice. He also contends that the testimony is inadmissible under Rule 404(b), Tenn. R. Evid., because the state failed to show by clear and convincing evidence that the defendant committed a prior crime and because the probative value of the evidence is outweighed by its prejudicial effect. We disagree with the defendant's contentions.

Under Rule 404(b), Tenn. R. Evid., evidence of other crimes, wrongs, or bad acts is admissible only upon (1) the trial court upon request holding a jury-out hearing, (2) the trial court determining that a material issue exists other than conduct conforming with a character trait which allows for the admission of the evidence, and (3) the trial court determining that the probative value of the evidence is not outweighed by the danger of unfair prejudice. The rule also provides that upon request, the trial court must state on the record the material issue, the ruling, and the reasons for admitting the evidence.

Although the defendant complains that the trial court failed to hold a jury-out hearing, a hearing over the testimony concerning the prior plan to rob a store was held outside the presence of the jury before the testimony was admitted. During the hearing, the state informed the court of its intention to call the three witnesses to testify that the defendant told them of his plan to rob a store approximately a week before the shooting. The defendant did not dispute what the content of the witnesses' testimony

17

would be or request that the trial court hear testimony from the witnesses before ruling on the issue. However, the defendant did object to the testimony during the trial, arguing that it was irrelevant and its risk of unfair prejudice outweighed its probative value. The trial court held that the evidence was admissible to show the defendant's intent and that the probative value of the evidence outweighed its danger of unfair prejudice. We agree with the trial court's assessment.

Evidence of other crimes or acts that are independent of the offenses on trial is admissible when it is relevant to a litigated issue, such as, identity, intent, or rebuttal of accident or mistake, and its probative value is not outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b), Advisory Commission Comment; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985); State v. Hooten, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). In this case, the state had the burden of proving that the defendant was involved in an attempted robbery at the time of the shooting. Proof that the defendant was planning a robbery of a store that sold gas and guns a week before the shooting that took place in this case was extremely probative of the defendant's intent. We agree with the trial court's conclusion that the probative value of the proof was not outweighed by the danger of unfair prejudice.

With respect to the defendant's contention that the testimony concerning his prior plan to commit a robbery was inadmissible because there was not proof by clear and convincing evidence that his prior conduct amounted to a crime, we note that Rule 404(b) is not limited to other crime evidence. The testimony at issue in this case related to the defendant's prior bad act of planning a robbery. Regardless of whether the defendant's prior conduct amounted to a crime, the testimony of the three witnesses was sufficient to establish by clear and convincing evidence that the defendant was involved in planning a robbery.

18

In consideration of the foregoing and the record as a whole, we affirm the defendant's conviction for first degree murder.

                                                Joseph M. Tipton, Judge

CONCUR:

Joe B. Jones, Presiding Judge

John K. Byers, Senior Judge